



## IN THE
# Court of Appeals of Indiana

City of New Albany,

*Appellant-Petitioner*

v.

Ecosystems Connections, LLC, and the Indiana Department of
Natural Resources,

*Appellees-Respondents*

---

August 28, 2025

Court of Appeals Case No.
24A-PL-2969

Appeal from the Floyd Superior Court

The Honorable Maria D. Granger, Judge

Trial Court Cause No.
22D03-2312-PL-1650

---

**Opinion by Judge Bradford**
Judges Pyle and Kenworthy concur.

**Bradford, Judge.**

# Case Summary

In February of 2021, Ecosystems Connections Institute, LLC ("ECI") requested permission from the Indiana Department of Natural Resources ("DNR") to remove the Providence Mill Dam (the "Dam"), a low-head dam, which had been built in Silver Creek more than 100 years ago. The City of New Albany, Indiana (the "City"), opposed ECI's request. DNR granted ECI permission to remove the Dam, a decision that was affirmed by the Natural Resources Commission (the "Commission"). The City sought judicial review of the agency review board's decision. The trial court affirmed the decision of the agency review board, leading to the instant appeal. The City raises numerous claims of error. We affirm.

# Facts and Procedural History

The Dam is a "low-head dam" located on Silver Creek. Appellant's App. Vol. V p. 154. A low-head dam is "a manmade in-channel structure in a watercourse that is capable of generating hazardous recirculating currents that pose a risk to public health and safety and causes the watercourse to have a vertical drop of twenty-five (25) feet or less." Ind. Code § 14-27-7.3-2. "Silver Creek is a tributary to the Ohio River in south-central Indiana and flows in a southerly direction between [the City] and Clarksville." Appellant's App. Vol.

V p. 155.  On July 19, 1984, the U.S. Army Corps of Engineers determined that Silver Creek was a navigable waterway.

## I. ECI's Request for a Permit to Remove the Dam

On February 2, 2021, ECI filed a permit application with the DNR pursuant to Indiana Code section 14-28-1-22(c), requesting permission to remove the Dam. ECI's application described its project rationale as follows:

> Silver Creek is a tributary to the Ohio River in south-central Indiana and flows in a southerly direction between the [City] and Clarksville.  Silver Creek is a fifth order stream with a watershed area of approximately 97,400 acres and a mainstem length of approximately 90 stream miles.  The watershed is a 10-digit HUC (0514010108) and includes six 12-digit HUC watersheds: 051401010801 - Miller Fork, 051401010802 - Headwaters-Silver Creek, 051401010803 - Blue Lick Creek, 051401010804 - Sinking Fork, 51401010805 – Pleasant Run-Silver Creek, [and] 051401010806 - Jacobs Creek-Silver Creek (Silver Creek Watershed Management Plan A305-6-172).  The watershed is part of the Pre-Wisconsinian Drift Plains ecoregion and land use across the watershed is approximately 50% agriculture with approximately 25% being hay and pasture and 25% row crops. The upper portion of the watershed is primarily forestland and the lower portion of the watershed is urban.  This region of Indiana has increased in population with the cities of New Albany and Clarksville.  Like other streams across the Midwest United States, low[-]head dams were constructed in the basin to provide waterpower for grist mills and sawmills.  Currently there are two dams remaining in the basin.  The [Dam] (RM 0.9) and the Blackiston Mill dam at (RM 4).  Both dams were built in the mid-19th century and both are antiquated and are major fish barriers and human safety threats and should be removed.  The focus of this project is to remove the [Dam.]

Appellant's App. Vol. V p. 155.  ECI's application stated that

> Silver Creek is a priority sub-basin to the Ohio River for [the
> United States Fish and Wildlife Service], [DNR], Indiana
> Department of Environmental Management, and the River
> Heritage Conservancy.[1]  The Silver Creek basin and the
> proposed dam removal of the [Dam] addresses Strategy 1 of
> priorities to maintain and improve stream hydrologic parameters;
> Strategy 2.3, and 2.5 referring to structural and function stream
> restoration by removing [ ] low-head dams; and Strategy 3 to
> reconnect a fragmented stream ecosystem.

Appellant's App. Vol. V p. 157.

[4]     ECI's permit application indicated that it had previously successfully completed five similar dam removal projects and the goal with this project was "to remove the [Dam] and reduce the hazard to humans and improve the ecological integrity of the river."  Appellant's App. Vol. V. p. 158.  In support, ECI alleged that

> [a]ntiquated low[-]head dams, such as the [Dam], are known to
> be significantly disruptive ecologically and result in a cascade of
> environmental perturbations and instream habitat degradation.
> These obsolete dams pose a serious and dangerous threat to
> human safety as well.  The positive responses of instream habitat
> and fish community structure and function have been well
> documented as a result of previous dam removals[.]…  It is
> reasonable to expect the same response in Silver Creek after the

---

[1] The United States Fish and Wildlife Service, Ohio River Basin Fish Habitat Partnership, ECI, River Heritage Conservancy, and DNR are listed as project partners in the documents relating to ECI's permit application.

> [Dam] has been removed. It is noteworthy to mention that in addition to the ecological benefits, the human danger factor is eliminated in this stream with heavy recreational interests. There is now a large body of scientific literature that documents the ecological lift for a stream ecosystem after dams have been removed.

Appellant's App. Vol. V pp. 159–60. ECI's permit application indicated that removal would be completed by excavation, with care given to removing all debris without damaging the stream channel. After completing numerous levels of review and holding a public hearing on the matter, on June 9, 2021, DNR issued a Certificate of Approval permitting the removal of the Dam (the "Permit").

## II. Agency Review

On June 25, 2021, the City filed a petition for administrative review with the Commission, alleging that DNR's approval of the Permit did not comply with the Flood Control Act ("FCA"). The Commission "is the ultimate authority of" cases involving DNR actions. Appellant's App. Vol. III p. 4. The Commission appointed an Administrative Law Judge ("ALJ") to preside over the matter.

On October 13, 2022, the City moved for an immediate and emergency stay of activity to remove the Dam. The City's motion to stay was denied on December 12, 2022. In denying the City's motion to stay, the ALJ concluded as follows:

44. The City argues that because the owner of the Dam has not been identified, the Department could not have given the owner of the Dam notice of the permit as required by AOPA. According to the City, failure to provide notice to the owner should result in invalidation of the permit.

45. It is reasonably concluded from the evidence presented at the stay hearing that either the State owns the Dam or the ownership of the Dam is not known.

****

47. The City claims the Department has not provided proper notice of the permit to "each person who has a substantial and direct proprietary interest in the subject of the order" as required by I.C. § 4-21.5-3-5(b)(5). The City further claims it may attack the failure to provide notice on behalf of the owner of the Dam.

****

53. The City does not claim it was entitled to notice under sections (b)(5) or (b)(6). It is therefore not an "unnotified person" as the term is used in I.C. § 4-21.5-3-5(f).

54. The City may not assert lack of notice on behalf of the owner of the Dam.

55. The City also argues the permit does not comply with the [FCA], found at I.C. § 14-28-1, because the owner did not apply for the permit.

****

59. There is no requirement in the statute that the owner of the impacted property apply for the permit. Rather, I.C. § 14-28-1-22 requires the person who desires to undertake the regulated activity to apply for the permit.

60. Further, the Department "shall issue" the permit if the conditions in I.C. § 14-28-1-22(e) are met. There is no requirement the permit be issued only to the owner of the property.

****

67. The City has not established a likelihood of success on the merits on the issues of lack notice to the owners under [Indiana's Administrative Orders and Procedures Act ("AOPA")] and failure to comply with the [FCA].

68. As the City has not demonstrated it is likely to succeed on this issue at the hearing on the merits, the questions of whether the City must also show it would suffer irreparable harm if the stay were denied and whether the threatened harm to the City outweighs the harm to the permittee will not be addressed.

Appellant's App. Vol. VIII pp. 8–12.

[7]    On March 14, 2023, ECI moved for summary judgment and DNR filed a response in concurrence with ECI's motion. The City opposed ECI's summary-judgment motion and designated the affidavit of Larry Summers ("the Summers Affidavit") in support of its position. In his affidavit, Summers provided opinions on "climate change, 'environmental restoration,' and how Dam removal [would] affect fish, wildlife, and botanical resources …; low[-]head dam safety …; the effect Dam removal will have on property values …; and ownership of the Dam." Appellant's App. Vol. III pp. 226–27. However, Summers had previously acknowledged that he was not an expert in these areas

and, when questioned about these topics, had stated that he would defer to the experts. ECI moved to strike the Summers Affidavit arguing that

> [u]nder Indiana Rules of Evidence 702 and 401, a proposed expert's opinions are appropriately excluded or stricken when the expert is insufficiently qualified, the opinion does not rest upon reliable scientific principles, or the opinion is not relevant to an issue to be decided in the case. Mr. Summers'[s] affidavit should be stricken on all those grounds.

Appellant's App. Vol. III pp. 223–24. The ALJ granted ECI's motion to strike the Summers Affidavit on August 14, 2023.

[8] On November 15, 2023, the ALJ issued an order granting ECI's motion for summary judgment. In this order, the ALJ found that, substantively, the "matter is governed by … the [FCA]." Appellant's App. Vol. III p. 4. The ALJ also found the following, uncontested facts:

> 43. The Department received a permit application on February 2, 2021[,] prepared by ECI. The project for which the permit was sought is described as removal of [the Dam].
>
> 44. Silver Creek is listed as a Navigable Waterway in Floyd County "navigable from its junction with the Ohio River for 3.0 miles" in Information Bulletin 3, *Navigable Waterways Roster, Fifth Amendment*, (IB 3) DIN 20211020-IR-312210433NRA. According to research held by the Commission, Silver Creek was included in IB 3 based on a determination of navigability by the Army Corps of Engineers.
>
> ****
>
> 47. Included within the Department's permit application file is a statement from the United States Department of the Interior Fish

and Wildlife Service regarding the impact removal of the Dam would have on the "Loop Island Wetlands" located downstream of the Dam. The letter states that "water velocities, water depths, and most importantly shear stress at the location of the Wetlands are expected to experience NO CHANGES between now and the removal of the Dam."

48. A public hearing to discuss the removal of the Dam was held March 31, 2021.

49. The permit was approved by the Department on June 9, 2021.

****

51. If a project for which a permit is sought under the [FCA] will result in a loss or decrease of effective cross-sectional flow area of the floodway, the applicant may be required to submit computer-generated modeling to determine the impact of the project.

52. If such a project will result in an increase of the effective cross-sectional flow area and will therefore have no negative effects on the floodway during a regulatory flood event, no computer modeling is required.

53. ECI was not required to submit hydraulic modeling associated with the removal of the Dam because removal of the Dam would increase, rather than decrease, the cross-sectional flow area of the floodway of Silver Creek.

54. After [the Permit] was approved, Christopher B. Burke Engineering prepared a modeling report associated with the proposed Dam removal. The modeling analysis concluded that removal of the Dam would result in no increased surcharge upstream or downstream of the Dam.

55. The Department's interpretation of 312 IAC 10-2-3 is that if the proposed project will not increase surcharge in excess of .14 feet upstream of the project during a 100-year flood event, the

project does not constitute an "unreasonable hazard to the safety of life or property."

56. The Dam removal project complies with the Department's hydraulic requirements.

57. Daniel Gautier has been employed by the Department Division of Fish and Wildlife as an Environmental Biologist for the past 20 years. He has been directly involved in the review of permit applications for construction in a floodway, particularly with respect to potential impacts to fish, wildlife, and botanical resources caused by proposed construction projects. His focus is whether the work proposed in a permit application will cause unreasonable detrimental impacts to fish, wildlife and botanical resources.

58. Gautier conducted the fish, wildlife, and botanical impact review of ECI's application. As part of his review, he solicited input from other members of the Department's Division of Fish and Wildlife.

59. Gautier noted that there would be erosion and sedimentation during deconstruction, but those impacts would not be unreasonably detrimental.

60. Gautier determined the following:

- No potential wetlands would be affected;
- There will be no impact to fish or mussels and their habitat;
- There will be no impact to the habitat of endangered species;
- No contaminants were observed;
- The river/stream affected by the project (Silver Creek) is not on the list of natural, scenic, or recreational rivers in Indiana;
- Silver Creek is not on IDEM's list of impaired biotic communities.

61. Effects to silver maple saplings/whips will not be unreasonably detrimental. A condition of the permit requiring revegetating bare and disturbed areas would cure any concerns about the effects to silver maple saplings/whips.

62. Erosion and sedimentation during deconstruction of the dam would occur, but those impacts would not be unreasonably detrimental and should be minimized with implementation of erosion and sediment control conditions in the permit.

63. Matt Mead, a Water Resources Engineer employed by Christopher B. Burke Engineering, LLC, prepared hydraulic analysis of the proposed removal of the Dam after the permit was granted. He determined removing the Dam would not result in an increase of surface water elevations upstream of the Dam but would decrease flood elevations of up to -0.15 feet during a 100-year flood event and would result in no increase in regulatory flood elevations downstream of the Dam.

64. Mead determined that under no modeled scenario does the Dam removal result in an increase in regulatory flood elevations.

65. In Mead's professional opinion, the removal of the Dam complies with all the Department's hydraulic requirements.

66. Jerry Sweeten is the Senior Restoration Ecologist and an owner of ECI. He holds a Bachelor of Science in Biology and Environmental Studies, a master's degree in Natural Resources with a teaching minor in Environmental Education and a Ph.D. in Aquatic Ecology. Sweeten has studied and documented the effects of dam removal on the aquatic habitat streams, using the Index of Biotic Integrity with the Qualitative Habitat Evaluation Index. He has prepared several reports on removal of low head dams in Indiana and Michigan.

67. Sweeten determined the substrate of Silver Creek is not good habitat for freshwater mussels, and he found no evidence of live mussels or shell material during his survey of Silver Creek.

68. Sweeten opined removal of the Dam would have the following impacts:

> a) After Dam removal, the sediment currently trapped behind the Dam will fill the plunge pool downstream of the Dam and the stream bottom will return to normal riffle, pool run morphometry which will benefit Silver Creek.
> b) There will be no adverse sedimentation downstream of the Dam after removal and there will be no adverse affects on the Loop Island Wetlands located downstream of the Dam;
> c) Removal of the Dam will result in an increase in fish species richness and abundance upstream of the Dam; and
> d) Current safety hazard associated with the Dam would be eliminated.

69. The ownership of the Dam was contested at the Motion for Stay hearing held on November 22, 2022. There is no evidence [that] ownership of the Dam has been judicially determined.

Appellant's App. Vol. III pp. 8–12 (emphasis in original, internal record citations omitted).

[9] Applying the factual findings to the applicable law, the ALJ concluded as follows:

> 77. A person desiring to "erect, make, use, or maintain a structure, an obstruction, a deposit, or an excavation; or suffer or permit a structure, an obstruction, a deposit, or an excavation to be erected, made, used or maintained in or on a floodway" must obtain a permit issued by the Department. IC § 14-28-1-22(c).
>
> 78. The permit shall be granted if the Department determines "the applicant has clearly proven" the proposed activity will not:

1) adversely affect the efficiency of or unduly restrict the capacity of the floodway; 2) constitute an unreasonable hazard to the safety of life or property; 3) result in unreasonably detrimental effects upon fish, wildlife, or botanical resources. IC § 14-28-1-22(h).

****

80. The term "adversely affect the efficiency of, or unduly restrict the capacity of, the floodway" is defined as an "increase in the elevation of the regulatory flood elevation of at least fifteen-hundredths (0.15) of a foot as determined by comparing the regulatory flood elevation under the project condition to that under the base condition." 312 IAC 10-2-3.

81. A "regulatory flood" is "a flood having a one percent (1%) probability of being equaled or exceeded in a year as calculated by a method and procedure that is approved by the commission. The regulatory flood is equivalent to the base flood or the 100-year frequency flood." 312 IAC 10-2-35.

****

83. "Unreasonable hazard to the safety of life or property means a condition that is likely to: 1) be caused by the design or construction of the project; and result during a regulatory flood in either: (A) the loss of human life; or (B) damage to public or private property to which the license applicant has neither ownership nor a flood easement." 312 IAC 10-2-40.

84. "Unreasonable detrimental effects upon fish, wildlife, or botanical resource" is defined as "damage to fish, wildlife, or botanical resources that is found likely to occur by the director based upon the opinion of a professional qualified to assess the damage and: 1) creates a condition where recovery of the affected resources is not likely to occur within an acceptable period; and 2) cannot be mitigated through the implementation of a mitigation plan approved by the director." 312 IAC 10-2-39.

**Will the Removal of the Dam Adversely Affect the Efficiency of or Unduly Restrict the Capacity of the Floodway?**

****

86. The undisputed evidence is that no modeling was required because the removal of the Dam would increase, rather than decrease, the cross-sectional flow area of the floodway of Silver Creek. Knipe Affidavit. The City does not dispute Knipe's testimony in this regard. Further, the Burke report, submitted after the permit was approved, could not have been considered by the Department in reaching this determination.

87. As the removal of the Dam will not cause an increase in surcharge, the project will not adversely affect the efficiency of, or unduly restrict the capacity of, the floodway. 312 IAC 10-2-3.

**Will Removal of Dam Pose an Unreasonable Hazard to the Safety of Life or Property as Described in 312 IAC 10-2-40?**

****

89. 312 IAC 10-2-40 is concerned with the effects removing the Dam would have during a *regulatory flood* event.

90. The City's argument involves general damage to property ECI does not own. However, the City has not presented evidentiary material creating an issue of fact on the issue of whether removal of the Dam would result in a condition that is likely to result in the loss of human life or damage to public or private property not owned by ECI *during a regulatory flood event*.

91. Likewise, the City's argument that properties surrounding the Dam could generally be affected due to changes in water surface levels caused by removal of the Dam is not an inquiry relevant to the Department's review under 312 IAC 10-2-40 because it does not involve loss during a regulatory flood event.

**Will Removal of the Dam Cause Unreasonable Detrimental Effects upon Fish, Wildlife, or Botanical Resources?**

92. The Department's determination of whether the project will result in unreasonable detrimental effects upon fish, wildlife, or botanical resource [*sic*] is based on the opinion of a professional qualified to assess the effects the proposed project will have on fish, wildlife and botanical resources.

**\*\*\*\***

94. The undisputed evidence is that the effects the project could have on fish, wildlife or botanical resources was examined by the Department and it was determined that the effects would not be unreasonable.

95. The City has not presented evidence to dispute ECI's evidence on this issue.

**Does the Question of Ownership of the Dam Impact the Validity of the Permit?**

96. The City argues that the permit should not have been granted because ECI has no ownership interest in the Dam and no authority to enter the property surrounding the Dam as needed to remove it. According to the City's argument, it has ownership interests in the Dam and, because the City objects to the project, the permit should be denied.

97. Under Ind. Code § 14-28-1-22, the Department shall issue a permit if the conditions stated therein are met. This statute does not require the owner of the property on which the project will occur to apply for the permit. As previously discussed, the permit application meets the requirements of this statute.

98. Further, for the purposes of applications issued by the Department under the [FCA], the word "owner" is defined as the person:

> (1) listed on the tax assessment rolls as being responsible for the payment of real property taxes imposed on the property; and
> (2) in whose name title to real property is shown.

I.C. § 14-11-4-1.

99. The City has not presented evidence that it is listed on the tax assessment rolls or that title to the Dam is listed in the City's name. Therefore, it is not an owner as defined by statute.

****

101. The Commission has no authority to impose a requirement to I.C. § 14-28 that did not exist when the permit was approved.

102. Further, the Commission's authority is limited to that provided by the legislature. The Commission has no authority to determine ownership of property. That issue is left to the circuit and superior courts of the county. There is no evidence that ownership of the Dam has been determined by a county circuit or superior court or any other court of relevant jurisdiction.

**Navigability of Silver Creek:**

103. The City also argues Silver Creek is not a navigable waterway because the determination Silver Creek is navigable is not based on a judicial determination.

****

105. "Navigable" is defined in 312 IAC 1-1-24 as a

waterway that has been declared to be navigable or a public highway by one (1) or more of the following:

> (1) A court.
> (2) The Indiana General Assembly[.]
> (3) The United States Army Corp of Engineers.
> (4) The Federal Energy Regulatory Commission.

(5) A board of county commissioners under IC 14-29-1-2.

(6) The commission following a completed proceeding under IC 4-21.5.

106. The City argues that the determination of navigability of Silver Creek was determined by the Army Corp of Engineers. See Wilson Affidavit. Therefore, by definition, Silver Creek is a navigable waterway.

107. In its Brief in Opposition of ECI's Motion for Summary Judgment, the City, for the first time, argues that assuming navigability of Silver Creek at the Dam, ECI's permitting process is not complete because the Department did not conduct the review required under I.C. § 14-29-1, the Navigable Waterways Act (NWA).

****

109. The City's petition requested review of FW-30915-0 under § 4-28-1, the [FCA]. The City has not requested amendment of its petition pursuant to I.C. § 4-21.5-7 to include a request for review of the permit under the Navigable Waterways Act (NWA).

****

113. Respondents were not put on notice that the City is also seeking review of the permit until almost three years after the Petitioner [*sic*] for review was filed.

114. If, as the City argues, the NWA imposes additional conditions on the review of the permit, Respondents were entitled to notice of this legal theory before this late stage in the proceedings.

115. The City's argument the requirements of the NWA have not been examined is therefore waived.

Appellant's App. Vol. III pp. 13–18 (emphases in original).

## III.  Judicial Review

[10]     On December 1, 2023, the City petitioned for judicial review of the Commission's determination.  The City alleged that

> the agency's action and final decision is invalid and the City has been prejudiced by the action that is, among other things, arbitrary, capricious, an abuse of discretion, not in accordance with the law or Indiana's [FCA], without observance of required procedure, contrary to constitutional right, power, privilege, or immunity, is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and is otherwise unsupported by substantial evidence.

Appellant's App. Vol. II p. 28.  Specifically, the City alleged that the Commission's order was erroneous as (1) neither ECI nor the DNR could demonstrate that the owner of the Dam had received notice of the permit application; (2) the effect of the Commission's decision "is tantamount to unlawfully and unconstitutionally granting ECI the ability to take and destroy the property of another even though ECI lacks eminent domain authority, is not taking the Dam for a public purpose, and has not paid just compensation" to the Dam owners; (3) the Commission's determination "fails to properly interpret the [FCA] and fundamental Indiana law establishing that a stranger to property that lacks consent of an owner cannot obtain a permit to remove or destroy such property;" (4) the ALJ erred in finding that the City had waived its challenge to the question of whether the Silver Creek is a navigable waterway;

(5) "the ALJ erred by refusing to consider the 1995 Road Transfer Agreement, particularly in connection with" the question of ownership; and (6) the ALJ erred by striking the Summers Affidavit. Appellant's App. Vol. II p. 29.

[11] DNR responded to the City's petition on December 29, 2023, arguing that the City's petition was "without merit." Appellant's App. Vol. II p. 56. Also on December 29, 2023, ECI responded to the City's petition, arguing that "[t]he final agency order at issue in this cause is fully supported both by Indiana law and substantial evidence." Appellant's App. Vol. II p. 59.

[12] Following a hearing, the trial court issued an order denying the City's petition for judicial review. In its order, the trial court concluded that the City "has not been prejudiced by the actions of DNR, and the agency action at issue was not arbitrary and capricious; an abuse of discretion; contrary to law; without observance of procedures required by law; or unsupported by the substantial evidence produced in the agency proceedings." Appellant's App. Vol. II p. 21.

# Discussion and Decision

## I. Standard of Review

[13] "When we review an administrative agency's decision, we stand in the trial court's shoes. As in the trial court, the burden of demonstrating the invalidity of agency action is on the party to the judicial review proceeding asserting invalidity." *Ind. State Ethics Comm'n v. Sanchez*, 18 N.E.3d 988, 991 (Ind. 2014) (internal citation and quotation omitted). "We do not reweigh the evidence;

rather, we consider the record in the light most favorable to the Commission's decision." *Id.* at 992. "We will affirm the Commission unless its conclusions are clearly erroneous." *Id.*

The City challenges the trial court's order upholding the Commission's administrative decision. Under AOPA, we may set aside an agency's action if it is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (2) contrary to constitutional right, power, privilege, or immunity;
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (4) without observance of procedure required by law; or
> (5) unsupported by a preponderance of the evidence.

Ind. Code § 4-21.5-5-14(d).

> With AOPA in mind, we note that our review of agency action is intentionally limited, as we recognize an agency has expertise in its field and the public relies on its authority to govern in that area. We do not try the facts de novo but rather defer to the agency's findings if they are supported by substantial evidence. On the other hand, an agency's conclusions of law are ordinarily reviewed de novo. While we are not bound by the agency's conclusions of law, an interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. In fact, if the agency's interpretation is reasonable, we stop our analysis and need not move forward with any other proposed interpretation.

*Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 619 (Ind. 2019) (brackets, ellipsis, citations, and quotations omitted).[2] "This is true even if another party presents 'an equally reasonable interpretation.'" *Jay Classroom Tchrs. Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016) (quoting *Chrysler Grp., LLC v. Rev. Bd. of Ind. Dept. of Workforce Dev.*, 960 N.E.2d 118, 124 (Ind. 2012)).

## II. Issues for Review

## A. Indiana Code section 14-28-1-22

### 1. Whether Indiana Code section 14-28-1-22 Applies to ECI's Request to Remove the Dam

[15] The Indiana General Assembly codified the FCA at Indiana Code chapter 14-28-1. Indiana Code section 14-28-1-22 contains provisions relating to "Structures in Floodways; Construction." At the time ECI filed its permit application, Indiana Code section 14-28-1-22 provided as follows:

> (c) A person who desires to:
> (1) erect, make, use, or maintain a structure, an obstruction, a deposit, or an excavation; or
> (2) suffer or permit a structure, an obstruction, a deposit, or an excavation to be erected, made, used, or maintained;

---

[2] While the Indiana General Assembly has since altered the standard of review under AOPA, the changes only apply to administrative review proceedings that commence after June 30, 2024. Ind. Code § 1-1-5.5-24. It is undisputed that the review proceedings in this case commenced before June 30, 2024.

in or on a floodway must file with the director a verified written application for a permit accompanied by a nonrefundable minimum fee of two hundred dollars ($200).

(d) The application for a permit must set forth the material facts together with plans and specifications for the structure, obstruction, deposit, or excavation.

(e) An applicant must receive a permit from the director for the work before beginning construction. The director shall issue a permit only if in the opinion of the director the applicant has clearly proven that the structure, obstruction, deposit, or excavation will not do any of the following:

> (1) Adversely affect the efficiency of or unduly restrict the capacity of the floodway.
> (2) Constitute an unreasonable hazard to the safety of life or property.
> (3) Result in unreasonably detrimental effects upon fish, wildlife, or botanical resources.

(f) In deciding whether to issue a permit under this section, the director shall consider the cumulative effects of the structure, obstruction, deposit, or excavation. The director may incorporate in and make a part of an order of authorization conditions and restrictions that the director considers necessary for the purposes of this chapter.

Indiana Code section 14-28-1-22 has been found to apply to the Permit at all prior stages of this litigation.

[16]    On appeal, the City contends that the Permit is *void ab initio* because DNR did not have statutory authority to issue the Permit. Specifically, the City argues that Indiana Code section 14-28-1-22 does not apply to the removal of the Dam, asserting that Indiana Code section 14-28-1-22 only applies to the construction

of structures in a waterway, not the deconstruction or removal of a structure.[3] We disagree.

Again, Indiana Code section 14-28-1-22(c) provides that

> [a] person who desires to:
>> (1) erect, make, use, or maintain a structure, an obstruction, a deposit, *or an excavation*; or
>> (2) suffer or permit a structure, an obstruction, a deposit, *or an excavation* to be erected, made, used, or maintained;
> in or on a floodway must file with the director a verified written application for a permit[.]

(Emphases added). As it relates to utilities, the Indiana General Assembly has defined "excavate" as "an operation for the movement, placement, *or removal of earth, rock, or other materials in or on the ground* by use of tools or mechanized equipment or by discharge of explosives, including augering, backfilling, boring, digging, ditching, drilling, driving, grading, jacking, plowing in, pulling in, ripping, scraping, trenching, and tunneling." Ind. Code § 8-1-26-6 (emphasis added). We have previously interpreted the term "excavate" to encompass removal of any materials located *in or on* the ground. *S.E. Johnson Cos. Inc., v. N. Ind. Pub. Serv. Co.*, 852 N.E.2d 1, 7 (Ind. Ct. App. 2006) ("The concrete from the road was sawed into sections, and a quantity of rock and sand was being

---

[3] Both ECI and DNR assert that the City has waived this argument for failing to raise it below. "It is well-established that failure to raise an argument or issue below results in waiver of that issue." *N.H. Ins. Co. v. Ind. Auto. Ins. Plan*, 176 N.E.3d 514, 524 n.4 (Ind. Ct. App. 2021), *trans. denied*. We decide to reach the merits of the City's argument about Indiana Code section 14-28-1-22 regardless of waiver.

moved—or removed—in the process."), *trans. denied*; *cf. Miami Cnty. Bd. of Comm'rs v. US Specialty Ins. Co.*, 158 N.E.3d 415, 421 (Ind. Ct. App. 2020) (finding that the removal of materials did not qualify as excavation because the materials had not been "in or on the ground" but instead had been piled up to six feet above and on the surface of the Wabash River), *trans. denied*. Further, in interpreting a prior version of the FCA, the Indiana Supreme Court noted that the FCA governs activities within the floodways of Indiana rivers and streams and "provides that no one may conduct a construction *or excavation project within a floodway* without first receiving a permit from DNR." *Nat. Res. Com'n of Ind. Dept. of Nat. Res. v. Porter Cnty. Drainage Bd.*, 576 N.E.2d 587, 588 (Ind. 1991) (emphasis added).

[18]     Again, ECI indicated that its removal strategy for the Dam was as follows:

> **Removal Strategy**:  An excavator is proposed to break the concrete into manageable pieces that can be safely handled and removed from the stream channel.  The debris will be removed in a one-step process and care will be given to the minimum amount of sediment entering the stream during the removal. Debris will be loaded on trucks along the north side of the river. The debris will be transported to an approved site and documented through chain of custody.  Entry to the stream channel will also be from the north.  There is an estimated 15 cubic yards of cobble and gravel behind the dam.

Appellant's App. Vol. V p. 160 (emphasis in original).  ECI's permit application and the related documents clearly indicate that this case involves an excavation of the Dam, as there is no question that the materials will be removed from in

or on the ground. The work to remove the Dam, *i.e.*, the excavation of the Dam, therefore clearly falls under the purview of Indiana Code section 14-28-1-22. The City's claim that DNR did not have the statutory authority to issue the Permit for the Dam's removal under Indiana Code section 14-28-1-22 is without merit.[4]

## 2. Whether Recent Changes to Indiana Code section 14-28-1-22 Apply Retroactively

[19] It is undisputed that effective July 1, 2023, Indiana Code section 14-28-1-22 was amended to add the requirement for documentation to prove that the applicant either owns the site where the work will be completed or has the owner's express authorization to complete the work.[5] In adopting the amendment, the General Assembly stated that the amendment would take effect on its stated effective date and made no mention of retroactive application. Despite the fact that the change to the statute was undisputedly made approximately two years after the Permit was issued, the City alternatively argues that the statute should, at this juncture, be applied retroactively to impose the ownership requirement

---

[4] Because we find the plain language of Indiana Code section 14-28-1-22 to be clear in its application to excavation projects, we reject the City's assertion that it is ambiguous.

[5] In amending the Statute, the General Assembly added, *inter alia*, subsection (e), which provided as follows:

> A person who files a permit application under this section must provide:
>
> (1) documentation of the person's ownership of the site where the proposed work will be performed; or
>
> (2) an affidavit from the owner of the site where the proposed work will be performed expressly authorizing the performance of the proposed work on that site.

Ind. Code § 14-28-1-22(e) (2023). The statute was again amended, effective July 1, 2024, to exclude governmental entities (including the state or a county, city, or town) from the ownership requirement.

to ECI's permit.  In support, the City asserts that the amendment should be read as a clarification, which it claims would be applied retroactively, as opposed to a change in the law, which it admits would not.

[20]  "Absent explicit language to the contrary, statutes generally do not apply retroactively."  *N.G. v. State*, 148 N.E.3d 971, 973 (Ind. 2020).  Thus, "[t]he general rule in Indiana is that statutes are to be given prospective effect only, unless the legislature unequivocally and unambiguously intended retrospective effect as well."  *Johnson v. State*, 36 N.E.3d 1130, 1134 (Ind. Ct. App. 2015) (brackets added, internal quotation and brackets removed), *trans. denied*.  "Ultimately however, whether or not a statute [or amendment] applies retroactively depends on the Legislature's intent."  *Bourbon Mini–Mart, Inc. v. Gast Fuel & Servs., Inc.*, 783 N.E.2d 253, 260 (Ind. 2003).

[21]  The best evidence of the General Assembly's intent is found in the actual language used within a statute or an amendment.  *Clark Cnty. v. Ind. Dept. of Loc. Gov't Fin.*, 12 N.E.3d 1000, 1005 (Ind. T.C. 2014).  Here, the words of the amendment unambiguously provided that it was not entitled to retroactive effect.  Public Law 191-2023 explicitly stated that the amendments were "EFFECTIVE JULY 1, 2023[.]"  2023 Ind. Legis. Serv. P.L. 191-2023 (S.E.A. 412) (capitalization in original).  Nothing in Public Law 191-2023 indicates that the General Assembly intended for the changes to be applied retroactively, and the City has cited to no authorities suggesting such.  Based on the language used by the General Assembly in amending the statute, we conclude that the

amendment was intended to apply prospectively only. The City's assertion otherwise is without merit.[6]

## B. The Summers Affidavit

[22] The City next contends that the ALJ abused its discretion by striking the Summers Affidavit. Indiana Evidence Rule 702 provides that

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

The factfinder is considered the gatekeeper for the admissibility of expert opinions under Evidence Rule 702. *Est. of Borgwald v. Old Nat. Bank*, 12 N.E.3d 252, 257 (Ind. Ct. App. 2014).

---

[6] On judicial review, the trial court affirmed the ALJ's conclusions that Silver Creek is a navigable waterway and that "either the State owns the Dam or ownership is not known." Appellant's App. Vol. II p. 18. In making its conclusion regarding ownership of the Dam, the ALJ rejected the City's claim that it had some ownership interest in the Dam. While it does not appear that there has been a judicial determination as to who owns the Dam, the ALJ's conclusion that the City does not own it is supported by authority of the Indiana Supreme Court, which suggests that because Silver Creek is a navigable waterway, the State owns the Dam. *See Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1173 (Ind. 2018) ("A century ago, our Court of Appeals recognized that, among those rights acquired upon admission to the Union, the State owns and holds 'in trust' the lands under navigable waters within its borders, 'including the shores or space between ordinary high and low water marks, for the benefit of the people of the state.' *Lake Sand Co. v. State*, 68 Ind. App. 439, 445, 120 N.E. 714, 716 (1918)"). Either way, as we conclude, ECI was not required to prove ownership of the Dam.

By requiring trial courts to be satisfied that expert opinions will assist the fact-finder and that the underlying scientific principles are reliable, Rule 702 guides the admission of expert scientific testimony.…

Where an expert's testimony is based upon the expert's skill or experience rather than on the application of scientific principles, the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and that the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact.

*Id.* (internal citations omitted).

[23] The City argues that the Summers Affidavit should not have been stricken because Summers qualified as an expert, or at the very least a skilled lay witness. In support, the City argues that Summers "has two bachelors degrees: one for civil engineering and the other for engineering management[,]" has a master's degree in civil engineering, and is currently on schedule for obtaining his PhD. Appellant's Br. p. 46. The City further argues that Summers's focus in his undergraduate studies was environmental engineering, and he has studied literature on the effect of water impoundment on wildlife.[7] Finally, the City argues that Summers has experience in hydraulic engineering,[8] dam construction, and water resources.

---

[7] The focus of Summers's studies at the graduate level "has primarily been transportation." Appellant's App. Vol. VII p. 84.

[8] Summers stated in his deposition, which was completed prior to the introduction of his affidavit that his experience in hydraulic engineering was limited and was focused on transportation projects.

In his affidavit, Summers provided opinions on "climate change, 'environmental restoration,' and how Dam removal [would] affect fish, wildlife, and botanical resources …; low head dam safety …; the effect Dam removal will have on property values …; and ownership of the Dam." Appellant's App. Vol. III pp. 226–27. Inconsistent with his affidavit, however, Summers had previously acknowledged numerous times in his deposition that he was not an expert in these areas and, when questioned about these topics, had stated that he would have to defer to the experts. Summers had also expressed concerns about the potential effect removal of the Dam may have on wildlife in his affidavit but had not cited to any reliable scientific sources to back up his concerns.

Despite his numerous acknowledgments that he is not an expert in many, if not all, of the relevant fields, Summers's affidavit was submitted as expert testimony opposing the expert testimony submitted by ECI in support of the Dam's removal. The Summers Affidavit also contained multiple irrelevant statements and unsupported opinions. ECI moved to strike the Summers Affidavit arguing that

> [u]nder Indiana Rules of Evidence 702 and 401, a proposed expert's opinions are appropriately excluded or stricken when the expert is insufficiently qualified, the opinion does not rest upon reliable scientific principles, or the opinion is not relevant to an issue to be decided in the case. Mr. Summers'[s] affidavit should be stricken on all those grounds.

Appellant's App. Vol. III pp. 223–24. The ALJ granted ECI's motion to strike the Summers Affidavit on August 14, 2023.

[26] In finding that the ALJ had not abused her discretion in striking the Summers Affidavit, the trial court found as follows:

> Larry Summers'[s] affidavit discussed and offered the following opinions: on the history of the Dam; fishing and recreation at or near the Dam; the River Heritage Conservancy Group and its desire to develop a "blueway"; the construction of public access area near the Dam and "investment" into the area near the Dam; the "scenic value" of the Dam; normal flow conditions of Silver Creek; "dam removal" as an "inefficient" way to restore the environment; how Dam removal "could negatively affect property values"; climate change in Indiana; "communities worldwide" taking water for granted; "significant effects of local wildlife"; safety around low[-]head dams being "a relatively new area of concern within the engineering community"; the "suitability" of dam removal as a "mitigation technique"; and alternatives to low[-]head dam removal and the City's permit application.
>
> Analyzing whether Dam removal will result in "[u]nreasonable detrimental effects upon fish, wildlife, or botanical resources" is a scientific endeavor and therefore triggers the reliability requirement of Rule 702(b). Larry Summers'[s] affidavit was not shown to be based upon reliable scientific principles, and the affidavit contained discussion not relevant to the issue. The ALJ's striking of Larry Summers'[s] affidavit for the inability to qualify him as an expert to offer opinions on ownership of the dam and the elements of the [FCA] did not amount to an abuse of discretion.

Appellant's App. Vol. II pp. 18–19 (internal record citations omitted, fourth set of brackets in original). Again, Summers, himself, admitted that he was not an expert in many, if not all, of the relevant fields and he largely, if not completely, failed to back up his opinions with citations to any reliable scientific principles. The Summers Affidavit was not shown to be based on reliable scientific principles and, as a result, we conclude that the ALJ did not abuse its discretion in striking the Summers Affidavit.

## C. Trial Court's Order Affirming the Commission's Award of Summary Judgment

[27] Finally, the City contends that the ALJ erred in granting ECI's motion for summary judgment. "A party may, at any time after a matter is assigned to an [ALJ], move for a summary judgment in the party's favor as to all or any part of the issues in a proceeding." Ind. Code § 4-21.5-3-23(a). An ALJ "shall consider a motion filed under subsection (a) as would a court that is considering a motion for summary judgment filed under Trial Rule 56 of the Indiana Rules of Trial Procedure." Ind. Code § 4-21.5-3-23(b).

> We review summary judgment using the same standard as the trial court: summary judgment is appropriate only where the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. All facts and reasonable inferences are construed in favor of the non-moving party. Where the challenge to summary judgment raises questions of law, we review them de novo. That the parties have filed cross-motions for summary judgment does not alter our standard of review.

*Quirk v. Delaware Cnty.*, 91 N.E.3d 1008, 1013 (Ind. Ct. App. 2018) (footnote and internal citations omitted).

[28] Again, in requesting a permit, an applicant must prove that its structure, obstruction, deposit, or excavation will not do any of the following: "(1) [a]dversely affect the efficiency of or unduly restrict the capacity of the floodway[;] (2) [c]onstitute an unreasonable hazard to the safety of life or property[; and] (3) [r]esult in unreasonably detrimental effects upon fish, wildlife, or botanical resources." Ind. Code § 14-28-1-22(e). The City does not challenge the Commission's order in so far that it relates to the first factor of Indiana Code section 14-28-1-22(e). We, therefore, limit our review to the second and third factors.

## 1. Whether Removal of the Dam Poses and Unreasonable Hazard to the Safety of Life or Property

[29] The Commission concluded that there was no issue of material fact as to whether removal of the Dam posed an unreasonable hazard to the safety of life or property as described in 312 Ind. Admin. Code 10-2-40.

> "Unreasonable hazard to the safety of life or property" means a condition that is likely to:
> > (1) be caused by the design or construction of a project; and
> > (2) result during a regulatory flood in either:
> > > (A) the loss of human life; or
> > > (B) damage to public or private property to which the license applicant has neither ownership nor a flood easement.

312 Ind. Admin. Code 10-2-40.

[30] The Commission concluded that "312 IAC 10-2-40 is concerned with the effects removing the Dam would have during a *regulatory flood* event" and that the City had

> not presented evidentiary material creating an issue of fact on the issue of whether removal of the Dam would result in a condition that is likely to result in the loss of human life or damage to public or private property not owned by ECI *during a regulatory flood event*.

Appellant's App. Vol. III p. 15 (emphases in original). In challenging the Commission's award of summary judgment to ECI, the City argues that it had designated evidence that would create an issue of material fact as to whether removal of the Dam would pose an unreasonable hazard to the safety of life or property. However, the only designated evidence pointed to by the City that was relevant to this question is the Summers Affidavit, which was stricken from the record. ECI designated significant evidence on this point, all of which indicated that removal of the Dam would not create an unreasonable hazard to the safety of life or property as described in 312 IAC 10-2-40. Based on the record before the ALJ and the Commission, we cannot say that the Commission erred in finding that no issue of material fact remained that would preclude summary judgment on this question.

## 2. Whether the Removal of the Dam Would Cause Unreasonable Detrimental Effects upon Fish, Wildlife, or Botanical Resources

[31] The Commission also determined that removal of the Dam would not cause unreasonable detrimental effects upon fish, wildlife, or botanical resources. In challenging the Commission's award of summary judgment to ECI, the City argues that it designated evidence that would create an issue of material fact as to whether removal of the Dam would pose an unreasonable hazard to the safety of life or property. As was the case with the above-discussed factor, the only designated evidence pointed to by the City that was relevant to this question is the Summers Affidavit, which, again, was stricken from the record. ECI designated significant evidence on this point, all of which indicated that removal of the Dam would not cause unreasonable detrimental effects upon fish, wildlife, or botanical resources. In fact, it is anticipated that removal of the Dam would have a positive impact upon fish, wildlife, and botanical resources. Based on the record before the ALJ and the Commission, we cannot say that the Commission erred in finding that no issue of material fact remained that would preclude summary judgment on this question.

[32] The judgment of the Commission is affirmed.

Pyle, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT
Matthew J. McGovern
Fishers, Indiana

ATTORNEYS FOR APPELLEE ECOSYSTEMS
CONNECTIONS INSTITUTE, LLC

Bradley R. Sugarman
Daniel P. McInerny
Jackson L. Schroeder
Bose McKinney & Evans LLP
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE INDIANA
DEPARTMENT OF NATURAL RESOURCES

Theodore E. Rokita
Indiana Attorney General

Kathy J. Bradley
Deputy Attorney General
Indianapolis, Indiana